98 F.3d 1346
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Carol Z. RICE, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner, Social Security
Administration, Defendant-Appellee.
 No. 95-35604.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 10, 1996.
Decided Oct. 9, 1996.
 
 Before: REAVLEY,* REINHARDT and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Claimant-appellant Carol Z. Rice appeals the summary judgment granted in favor of the Commissioner on Rice's claim for supplemental security income disability benefits. Rice makes four claims on appeal:[1] (1) the ALJ improperly determined that Rice's arthritis failed to meet the criteria of a listed impairment; (2) the ALJ erred in finding that Rice was capable of performing a "wide range of light or sedentary work;" (3) the ALJ's hypothetical posed to the vocational expert was improper because it failed to take into account Rice's mental impairments or fatigue; and (4) the ALJ improperly admitted the post-hearing report of a consulting psychologist without granting Rice's request for a supplemental hearing. We affirm.
 
 PROCEDURAL HISTORY
 
 3
 Rice applied for and was denied supplemental security income disability benefits both initially and upon reconsideration. Upon request by Rice, an administrative hearing was held on August 26, 1992. Rice, a medical advisor, and a vocational expert appeared at the administrative hearing. After the hearing the ALJ referred Rice to a psychologist, who diagnosed malingering. Rice requested a supplemental hearing to cross-examine the psychologist. Without granting the supplemental hearing, the ALJ denied Rice's claim. The Appeals Council declined to review the ALJ's decision, making that decision final.[2] Rice appealed to the district court, which referred the matter to a magistrate judge. Rice and the Commissioner filed cross motions for summary judgment. The magistrate judge granted the Commissioner's motion, and Rice now appeals.
 
 FACTS
 
 4
 At the time of the administrative hearing, Rice was 40 years old and living with her parents. She had completed high school and one year of a two year licensed practical nurse (LPN) training program. She never completed the second year of the LPN course. While the record contains evidence of various medical problems, including thyroid problems, Rice's psoriatic arthritis and mental impairments are the only medical conditions relevant to her disability claim.
 
 A. Medical Evidence
 1. Physical Impairments
 
 5
 Dr. Stephen King, M.D., saw Rice beginning in August, 1989, and continuing until September, 1991. His notes indicate a history of musculoskeletal complaints by Rice. King diagnosed fibromyalgia, along with secondary abdominal pain and irritable bowel syndrome.
 
 
 6
 In June of 1991 King referred Rice to Dr. Kenney, a rheumatologist. Kenney reported numbness and swelling in her hands, particularly the right one, pain, which became worse when she used the hand, and tenosynovitis in the right hand, which is "an inflammation of the tendon sheath." He also reported pain in her elbows and wrists. Kenney believed that Rice might have psoriatic arthritis.
 
 
 7
 In June of 1991 and November of 1991, two different doctors assessed Rice's residual functional capacity. Both opined that Rice was capable of performing light work.
 
 
 8
 In June of 1992 Rice saw Dr. King to have a physical capacities evaluation done for welfare purposes. King indicated that Rice was "capable of performing sedentary work, but would have difficulty in performing much beyond this."
 
 
 9
 In July of 1992, Kenney reported that Rice had psoriatic arthritis and chronic pain. He confirmed the diagnosis with a positive serologic test for rheumatoid factor, antinuclear antibodies, and an elevated sedimentation rate. Other objective medical evidence supporting the diagnosis were psoriatic plaques and "pain to palpation [at] multiple sites and loss of range of motion in hands and wrists." Kenney later clarified that Rice suffered "slight loss of range of motion."
 
 
 10
 Kenney made a residual physical capacity assessment, indicating that Rice could sit 2 hours at a time and four hours total in an 8 hour day, stand for 2 hours at a time and 2 hours total in an 8 hour day, and walk for 1 hour at a time and 2 hours total in an 8 hour day. He said she could continuously carry up to 5 pounds, frequently carry up to 10 pounds, and occasionally carry up to 25 pounds, but could never carry more than 25 pounds. He stated that Rice could never crawl or climb, but could occasionally (less than 1/3 of the time) bend, squat, kneel, crouch, balance, stoop, push, pull, manipulate things with her hands and fingers, feel, and use her feet for repetitive motions. He stated that Rice first experienced these physical limitations in early 1991. He stated that Rice was "presently under good disease control."
 
 2. Mental Impairments
 
 11
 Dr. King referred Rice to Sandra Neils, MSW, for counseling in March of 1992. Neils met with Rice for nine counseling sessions over a five-month period. Neils determined that Rice had a depressive disorder, which she described as "a recurring, mild depressive disturbance," marked by decreased energy, sleep disturbance, and feelings of worthlessness. She also diagnosed a dependent personality disorder. She found slight restrictions in activities of daily living and no difficulties in maintaining social functioning. She found that Rice seldom had deficiencies of concentration, persistence or pace. Neils made a mental residual functional capacity assessment. Neils indicated that Rice had a moderate limitation in the following areas: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for long periods of time; completing a normal workday or workweek without psychologically based symptoms; adapting to workplace changes; and setting realistic goals and making plans independently of others. Neils then explained some of her assessments, stating that "Carol maintains attention & concentration and can make simple work-related decisions, but when first placed in a job she may balk at this. Gentle but assertive supervision may be needed to develop consistent work behavior."
 
 
 12
 After the hearing the ALJ referred Rice to Dr. Dennis Pollack, Ph.D., a clinical psychologist, for an assessment of Rice's intellectual, emotional, and organicity status. Pollack conducted mental testing, such as counting backwards, and found Rice to be very slow. He measured her IQ at 79, which is in the "borderline range," but in his opinion "there was a significant lack of effort on her part." He also felt that this score was inconsistent with "the abilities that she would have to have to skip a grade."[3] Pollack administered an MMPI test, which he believed showed an exaggeration of her symptoms. Pollack cut off testing because he perceived a lack of effort. His diagnosis was malingering. This diagnosis was based in part on his interpretation of the medical evidence contained in her file, although Pollack is not a medical doctor.
 
 
 13
 In response to the ALJ's stated intention to admit into evidence Dr. Pollack's post-hearing report, Rice timely objected and, in the alternative, asked that a supplemental hearing be held if Pollack's report was admitted. Although Rice never withdrew her request for a supplemental hearing, the ALJ preliminarily directed Rice's counsel to submit certain documents in lieu of a supplemental hearing. Counsel submitted the requested documents along with letters from Kenney and Neils indicating that they disagreed with Pollack's assessment. Dr. Kenney noted that the medical evidence indicated psoriatic arthritis, and Neils stated that she had seen no evidence of malingering.
 
 B. Testimony at the Hearing
 
 14
 Dr. Lambert, a consulting physician, characterized Rice's arthritis as mild to moderate, concluding that Rice had difficulty in carrying out some activities, but that her symptoms did not meet any of the listings. He opined that Rice did not have a significant limitation in range of motion, but that repetitive motions would exacerbate her symptoms. He also opined that Rice's fatigue could be linked to arthritis or depression.
 
 
 15
 Rice testified that she worked for forty hours per week as a housekeeper for her uncle from June through August of 1991. Her duties included general housework, vacuuming, dusting, dishes, and making beds. She stated that she overmedicated herself to enable her to do the job, and quit because of the pain, especially noting that her right hand hurt so much she could not pick up a bucket with or without water in it. She also babysat infant twins of friends on a regular basis in 1990 for one dollar per day. She lives with her parents and has never been married. She has had no other job than the housekeeping job for her uncle, which she did at the order of her parents.
 
 
 16
 Rice testified that she could sit comfortably for only 15 minutes, and stand or walk for 10 minutes. She stated that she cannot lift anything over 5 pounds because of pain, cannot carry a 3 or 4 pound chair across a room, and cannot lift anything on her right side.
 
 
 17
 Rice complained of migraines which occur weekly and last from an hour to a day. She stated that she began to suffer them one month before the hearing, and believes they are caused by stress. She stated that episodes of passing out, which strike randomly, began at the same time. She stated that she has lost consciousness twice from dizziness during the past two weeks. She complained of severe allergies, which medication sometimes controls.
 
 
 18
 She testified that her right hand is almost completely useless, rendering her unable to cook, perform many household chores, or dress herself in clothes with buttons. She stated she has problems climbing stairs or squatting, and that she often falls over in a heap when she bends down. She said that she has bad short term memory, that her long-term memory is also going, and that she cannot remember anything before she was 18 years old. She testified that she is constantly tired and needs to rest for a couple of hours every day, and that she takes pills to help her sleep at night but still is kept awake by the pain. She testified that she takes two Tylenol tablets for the pain in her right hand and elbow.
 
 
 19
 The hearing recessed for five minutes to allow Rice to stand and walk and get a drink of water. She testified after the break that she had become dizzy, was getting a migraine headache and that her right side was totally numb.
 
 
 20
 Vocational expert Richard Ball also testified. In response to a hypothetical posed by the ALJ incorporating only Dr. Kenney's physical assessment of Rice's capabilities, Ball identified two jobs Rice was capable of performing: teacher's aide II and surveillance system monitor. Both jobs would provide alternative sit/stand options and flexibility in how they are performed. When Rice's counsel changed the hypothetical to include the mental limitations testified to by Neils, or the need to lie down during the day due to fatigue, Ball stated that neither of the jobs would be available. He also testified that the teacher's aide position would not be available to one whose dominant hand was severely limited, but that the surveillance position was.
 
 ANALYSIS
 
 21
 The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[4] The Commissioner is governed by a five-step sequential evaluation process in determining whether a claimant is disabled:
 
 
 22
 First, the claimant must not be currently working. Second, the claimant must have a severe impairment. Third, the impairment must be of equal severity and duration to those listed in an appendix. If these requirements are satisfied, the claimant is found disabled. If the third is not, the Social Security Administration proceeds to step four, and determines whether the impairment prevents the claimant from performing his past work. If not, the claimant is not disabled. If the claimant cannot perform his past work, then SSA reaches the fifth and final step: The claimant will be found disabled if he cannot perform any other work which exists in significant numbers in the national economy.[5]
 
 Standard of Review
 
 23
 We must uphold the Commissioner's determination that a claimant is not disabled if the findings of fact are supported by substantial evidence.[6] Substantial evidence is more than a mere scintilla, but less than a preponderance.[7] It is such evidence as a reasonable mind might accept as adequate to support a conclusion.[8] We must consider the record as a whole, not merely the evidence supporting the Commissioner.[9]
 
 
 24
 The ALJ followed the five-step process. First, the ALJ noted that Rice had never engaged in substantial gainful activity. Second, the ALJ determined that Rice's psoriatic arthritis with residual joint pain was a severe impairment.[10] Third, the ALJ determined that the arthritis did not meet any of the listings. Fourth, the ALJ noted that Rice had no past relevant work. And fifth, the ALJ determined that Rice could nevertheless perform jobs present in the national economy.
 
 1) Listed Impairment
 
 25
 When an individual's impairment meets or equals the criteria of a listed impairment, the individual is disabled.[11] Rice argues that the ALJ improperly determined that Rice's psoriatic arthritis does not meet or equal the criteria of Listed Impairment 1.02 ("Active rheumatoid Arthritis and Other Inflammatory Arthritis").[12] We review this issue under the substantial evidence standard.
 
 
 26
 There is no question that Rice meets the requirements of § 1.02(B). However, substantial evidence supports the finding that Rice does not meet the requirements of § 1.02(A). Rice argues that Dr. Kenney's report in July of 1992 establishes that she meets the listing. However, in that report Kenney stated that Rice had tenderness only, and not swelling, as required. Furthermore, even if we accept that Rice's right hand has a "significant restriction of function," there is little evidence that any other joint was so restricted at that time, as the listing requires. In fact, Dr. Kenney reported only a slight loss of range of motion in Rice's right hand, and stated that her arthritis "was presently under good disease control." This evidence was supported by Dr. Lambert, who characterized Rice's arthritis as mild to moderate.
 
 2) Residual Functional Capacity
 
 27
 Relying in part on Dr. Kenney's July 1992 residual functional capacity assessment[13] (RFC), described previously, the ALJ determined that Rice could perform a "wide range of sedentary and light exertion." Rice argues that the ALJ's determination is erroneous because Rice can neither sit long enough to perform sedentary work,[14] nor stand and walk long enough to perform light work.[15] We believe substantial evidence supports the conclusion that Rice can perform sedentary work. Two doctors in 1991 determined that Rice could perform light work. Dr. King, a treating physician, opined in June of 1992 that Rice could perform sedentary work. Dr. Lambert, the consulting physician, agreed. No professional involved in this case has said that Rice could not work. In short, the ALJ did not err in finding that Rice could perform sedentary work.
 
 
 28
 Furthermore, even if the ALJ's finding was erroneous, the error is harmless. The goal under step 5 of the disability analysis is to determine whether jobs exist for the claimant in the national economy. The ALJ posed a hypothetical to the vocational expert, asking whether jobs exist in significant numbers for a person with the physical limitations described by Dr. Kenney.[16] The vocational expert testified that two jobs were available, stressing that each had a sit-stand option and lifting and carrying requirements within appropriate limits.[17] Assuming for now that the hypothetical was valid, the vocational expert's answer meets the Commissioner's burden under step 5.[18]
 
 
 29
 3) Validity of the Hypothetical Posed to the Vocational Expert
 
 
 30
 If the hypothetical posed to the vocational expert is inaccurate or incomplete, the expert's testimony cannot be used to meet the Commissioner's burden under step 5.[19] Rice contends that the ALJ's hypothetical was incomplete because it did not include Rice's limitations due to mental impairments or fatigue. In response to questions by Rice's counsel, the vocational expert opined that if, in addition to the physical limitations described by Kenney, one assumed either the need to lie down for an hour each workday day due to fatigue, or the effects of Rice's mental impairments and depression as described by Neils, then no jobs exist in the national economy. The issue, then, is whether the ALJ properly failed to include fatigue or mental impairments in the hypothetical.
 
 
 31
 A mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.[20] Symptoms are a claimant's own description of his or her impairment, and alone are not enough to establish a mental impairment; signs include observable psychological abnormalities and must be medically demonstrable phenomena; laboratory findings must be shown through medically acceptable laboratory techniques.[21] The regulations are clear that reports about a claimant's impairments must come from "acceptable medical sources," and that a licensed social worker is not an accepted medical source.[22] Hence Neil's diagnosis of depression is not medical evidence that Rice has a mental impairment. It is true that, if an impairment had been established, Neil's report would constitute "[i]nformation from other sources," and could be used to "help [the SSA] to understand how [a claimant's] impairment affects [the claimant's] ability to work."[23] But before such information is competent to describe how an impairment affects work, the impairment must be established by medical evidence.[24]
 
 
 32
 Aside from Neils's report, Rice asserts that statements by Drs. King and Lambert are medical evidence of her depression. The record indicates otherwise. Neil's report states that she first saw Rice on referral from Dr. King for counseling for depression. A referral does not constitute medical evidence of depression. Dr. Lambert testified at the administrative hearing that depression could cause the fatigue described by Rice. This statement is not medical evidence that Rice is depressed.
 
 
 33
 In sum, the ALJ correctly declined to include mental impairments in the hypothetical to the vocational expert, because the record does not contain competent evidence of a mental impairment. We turn, therefore, to the issue of fatigue.
 
 
 34
 As discussed above, Rice testified that fatigue forced her to lie down for several hours each day, and the vocational expert opined that no jobs would exist for someone who needed to lie down one hour per workday and who additionally suffered from the physical limitations described by Dr. Kenney. Dr. Lambert testified that psoriatic arthritis could cause fatigue. The question, therefore, is whether the ALJ should have included the need to lie down in the hypothetical.
 
 
 35
 The ALJ's opinion does not explicitly discuss the issue of fatigue. Nevertheless, we believe that the ALJ implicitly but legitimately discredited Rice's statements about fatigue, and therefore correctly declined to include fatigue in the hypothetical. In order to reject a claimant's testimony about the effects of an impairment, an ALJ must provide specific, cogent reasons for disbelief and must "identify what testimony is not credible and what evidence undermines the claimant's complaints."[25] Unless there is affirmative evidence showing that the claimant is malingering,[26] the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing.[27] In this case, the ALJ provided sufficiently detailed reasons for discrediting the claimant's testimony.
 
 
 36
 The ALJ noted evidence of exaggeration and inconsistency between the claimant's testimony and the medical evidence. In particular, Rice testified that she could not sit for more than 15 minutes, stand for more than 10 minutes, or walk for more than 10 minutes at a time. The medical evidence from her own treating physician, however, diverged by a factor of six or more from these estimates. Similar divergences existed with regard to Rice's ability to lift and carry objects. Rice testified that she had no memory from before she was 18 years old, yet she never brought this to the attention of her doctors. Rice testified that one month before the hearing she began to experience migraines and losses of consciousness, but had never reported this to her doctors.[28] The ALJ also pointed out inconsistencies with Rice's testimony and other evidence or previous statements of hers.[29] The ALJ concluded that "given the entirety of the record, and the persuasive opinions of the claimant's treating and examining physicians, the claimant's testimony regarding her severe physical limitations cannot be found to be credible." We believe this conclusion is supported by clear and convincing evidence, and indicates that the ALJ considered and rejected Rice's testimony regarding fatigue.
 
 4) Supplemental Hearing Request
 
 37
 After the hearing, the ALJ referred Rice to Dr. Pollack for psychological testing. Upon receipt of Pollack's report, Rice objected to its admission and in the alternative requested a supplemental hearing. The ALJ directed Rice's counsel to submit certain documents. These documents were submitted. Although Rice's request for a supplemental hearing was never withdrawn, the ALJ stated that Rice had filed the documents in lieu of a hearing, and no supplemental hearing was ever held. Rice claims that the ALJ improperly denied her supplemental hearing request after announcing an intention to admit Pollack's report into evidence. Rice would have us adopt the Third Circuit's rule that when an ALJ accepts and considers a post-hearing medical report, the ALJ must grant a claimant's request to subpoena and cross-examine the author of that report.[30] Waiver of this right, Rice argues, must be clearly expressed or strongly implied from the circumstances.[31]
 
 
 38
 We need not adopt the Third Circuit's rule here. Even if the ALJ wrongfully denied Rice a supplemental hearing, this error was harmless because the ALJ did not need to, and did not in fact, rely on Pollack's report in concluding that Rice was not disabled. The ALJ's opinion describes the results of Pollack's psychological tests and notes that Pollack diagnosed malingering. The ALJ's opinion then states that "even if the psychological exam were not considered, as discussed below, there are numerous examples of inconsistencies in the claimant's testimony and statements." The opinion goes on to describe many of these inconsistencies, several of which we discussed above in considering whether the hypothetical posed to the vocational expert was complete and accurate. We reiterate what we concluded there: there was no competent evidence that Rice suffered from a mental impairment; and substantial evidence, separate from Pollack's report, supports the ALJ's finding that Rice's testimony was not credible.
 
 
 39
 Furthermore, the fact remains that all of the professionals involved in this case believe that Rice can work. As recently as June of 1992, Dr. King stated that Rice could perform sedentary work. Sandra Neils stated that Rice could work, though she believed Rice would need an appropriate supervisor initially. Based on Dr. Kenney's assessment, jobs exist for Rice in the national economy. And Dr. Lambert, based on a review of all the medical evidence, believed Rice suffered from a mild to moderate arthritis that limited her somewhat but left her able to work. Substantial evidence supports the ALJ's finding that Rice is not disabled.
 
 CONCLUSION
 
 40
 For the foregoing reasons, we AFFIRM the summary judgment entered by the district court against Rice.
 
 
 41
 AFFIRMED.
 
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Rice raises a fifth point of error, arguing that the ALJ failed to act impartially. We see no evidence of impartiality in the record
 
 
 [2]
 20 C.F.R. § 416.1481 (1995)
 
 
 [3]
 There is no evidence in the record that Rice skipped a grade. She graduated from high school at age 19, indicating she did not skip a grade. Thus the meaning of Pollack's statement is unclear
 
 
 [4]
 42 U.S.C. § 423(d)(1)(A)
 
 
 [5]
 Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir.1989) (citing 20 C.F.R. § 416.920(b)-(f))
 
 
 [6]
 42 U.S.C. § 405(g); Delgado v. Heckler, 722 F.2d 570, 572 (9th Cir.1983)
 
 
 [7]
 Desrosiers v. Secretary of Health and Human Servs., 846 F.2d 573, 576 (9th Cir.1988)
 
 
 [8]
 Id. (citing Richardson v. Perales, 402 U.S. 389, 401 (1971))
 
 
 [9]
 Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir.1989)
 
 
 [10]
 "Severe" impairments are "impairments which significantly limit[ ] [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a)
 
 
 [11]
 20 C.F.R. § 416.920(d)
 
 
 [12]
 20 C.F.R. Part 404, subpart P, App. 1 § 1.02 (1994) requires a claimant to have both:
 A. History of persistent joint pain, swelling, and tenderness involving multiple joints [which are the hip, knee, ankle, shoulder, elbow, or wrist and hand, which are considered together as one major joint] and with signs of joint inflammation (swelling and tenderness) on current physical examination despite prescribed therapy for at least three months, resulting in significant restriction of function of the affected joints, and clinical activity expected to last at least 12 months; and
 B. Corroboration of diagnosis at some point in time by either
 
 
 [1]
 Positive serologic test for rheumatoid factor; or
 
 
 [2]
 Antinuclear antibodies; or
 
 
 [3]
 Elevated sedimentation rate; or
 
 
 [4]
 Characteristic histologic changes in biopsy of synovial membrane or subcutaneous nodule
 
 
 [13]
 Residual functional capacity is what a person "can still do despite [the individual's] limitations...." 20 C.F.R. § 416.945(a)
 
 
 [14]
 Sedentary work generally requires an individual to sit for approximately six hours of an 8 hour day. SSR 83-10. We note that Social Security Rulings are final opinions and policy of the Social Security Administration, and as such are binding on ALJs, Paulson v. Bowen, 836 F.2d 1249, 1252 n. 2 (9th Cir.1988). This court gives deference to such rulings unless they conflict with the underlying statute or regulations. Bunnell v. Sullivan, 947 F.2d 341, 346 n. 3 (9th Cir.1991) (en banc)
 
 
 [15]
 To do the full range of light work, a person must be able to stand, on and off, for approximately six hours of an eight hour day. SSR 83-10
 
 
 [16]
 The ALJ asked the following hypothetical:
 [A]ssume the following hypothetical. A person of 39 years of age, with 13 years of education, 1 year in LPN schooling but she does not have a LPN certificate because she didn't complete the second year of that course work. With no past relevant work who has the following physical limitations. That they are only able to [sit] for 2 hours at a time, for 4 hours in an 8 hour day. They are only able to stand for 2 hours at a time, for a total of 2 hours in an 8 hour day. They are able to walk for 1 hour at a time, for a total of 2 hours in an 8 hour day. That they can occasionally, basically can engage in sedentary work as far as the exertional lifting and carrying requirement, that they can occasionally bend and squat, should never climb or crawl, can occasionally reach above shoulder level, occasionally kneel, crouch, balance, stoop, push, pull, handle gross manipulation with her hand and finger is fine manipulation. Grasp, feel, and use their feet for repetitive motion. And again, those are all occasionally. That they should avoid unprotected heights, moving machinery, that they should also avoid extreme changes in temperature and humidity. That they can occasionally drive. That they should avoid exposures to dust, fumes, gases and odors. And should avoid vibration, would this person be able to perform any work which exists in significant areas in the region or national economy?
 
 
 [17]
 Even though the teacher's aide position is listed as light work, the vocational expert explicitly stated that the lifting demands are not great. Even if this opinion is disregarded, however, the existence of the surveillance position, which is listed as sedentary work, renders the error harmless
 
 
 [18]
 See, e.g., Andrews v. Shalala, 53 F.3d 1035 (9th Cir.1995); DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir.1991)
 
 
 [19]
 Andrews, 53 F.3d at 1044; DeLorme, 924 F.2d at 850; Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir.1984)
 
 
 [20]
 20 C.F.R. § 416.908; see also 20 C.F.R. § 416.912(a)-(c) (medical evidence of impairment required)
 
 
 [21]
 20 C.F.R. § 416.928
 
 
 [22]
 20 C.F.R. § 416.913(a)
 
 
 [23]
 20 C.F.R. § 416.913(e)
 
 
 [24]
 Our analysis is corroborated by 20 C.F.R. § 416.920a(b), which requires a finding of an impairment by medical evidence before the work-related effects can be determined
 
 
 [25]
 Lester v. Chater, 81 F.3d 821, 834 (9th Cir.1995)
 
 
 [26]
 As will be discussed below, there was some evidence of malingering, but we disregard this evidence for purposes of this opinion
 
 
 [27]
 Id
 
 
 [28]
 It is true that Rice had previously complained to her doctors about headaches, but it is clear from Rice's testimony that the recent migraines were new and different
 
 
 [29]
 For example, Rice testified that she is unable to write because of pain, yet she filled out a nine-page intake form for her interview with Dr. Pollack
 
 
 [30]
 Wallace v. Bowen, 869 F.2d 187, 193 (3d Cir.1988)
 
 
 [31]
 Lonzollo v. Weinberger, 534 F.2d 712, 714 (7th Cir.1976)